1  MCDERMOTT WILL & EMERY LLP
   Julian L. André (SBN 251120)
2  jandre@mwe.com
   2049 Century Park East, Suite 3200
3  Los Angeles, CA 90067
   Telephone: (310) 551-9335
4  Facsimile: (310) 277-4730

5  Sam C. Neel (to file *pro hac vice*)
   sneel@mwe.com
6  Sarah P. Hogarth (to file *pro hac vice*)
   shogarth@mwe.com
7  500 North Capitol Street NW
   Washington, DC  20001
8  Telephone:   (202) 756-8000
   Facsimile:   (202) 756-8087

9
   ROBERTS & KEHAGIARAS LLP
10 Andrew D. Kehagiaras (SBN 207767)
   adk@tradeandcargo.com
11 Cameron W. Roberts (SBN 176682)
   cwr@tradeandcargo.com
12 100 West Broadway, Suite 660
   Long Beach, CA 90802
13 Telephone: (310) 642-9800
   Facsimile: (310) 868-2923

14
15 *Attorneys for Plaintiff*
   *AirBoss Defense Group, LLC*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| AIRBOSS DEFENSE GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SMART GLOVE HOLDINGS SDN BHD; SMART GLOVE INTERNATIONAL PTE LTD; SMART GLOVE CORPORATION SDN BHD; GX CORPORATION SDN BHD; SIGMA GLOVE INDUSTRIES SDN BHD; PLATINUM GLOVE INDUSTRIES SDN BHD,<br><br>Defendants. | CASE NO.  2:22-cv-6727<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. **Fraud By Concealment**<br>2. **Tortious Interference with Contract**<br><br>**JURY TRIAL DEMANDED** |

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

Plaintiff AirBoss Defense Group, LLC (ADG) for its complaint against defendants Smart Glove Holdings Sdn Bhd, Smart Glove International Pte Ltd., Smart Glove Corporation Sdn Bhd, GX Corporation Sdn Bhd, Sigma Glove Industries Sdn Bhd, and Platinum Glove Industries Sdn Bhd (collectively, Smart Glove or the Group) alleges as follows:

**INTRODUCTION**

1. ADG is a global leader in survivability solutions. It is committed to providing high quality personal protective equipment to medical frontline workers around the world. ADG's personal protective equipment is utilized by the U.S. Department of Defense, U.S. Department of State, FEMA, U.S. Department of Health and Human Services (HHS), Centers for Disease Control and Prevention, and other government agencies and private companies around the world.

2. In March 2021, ADG contracted with HHS to supply the agency with more than 18.2 million boxes of nitrile rubber gloves—a crucial tool for fighting the ongoing COVID-19 pandemic. Given the circumstances, time was of the essence in procuring these gloves to replenish HHS's supply and to ensure protection of the individuals on the frontlines. ADG engaged in a diligent worldwide search to find high-quality glove manufacturers to partner with ADG to meet HHS's urgent need. That search led ADG to Smart Glove.

3. Throughout April 2021 to June 2021, ADG conducted diligence, toured Smart Glove's facilities, and engaged in numerous discussions about Smart Glove's capabilities and then chose Smart Glove as its supplier. From July 2021 through September 2021, ADG engaged in semi-weekly discussions with Smart Glove personnel regarding the production, shipment, and delivery of the gloves.

4. Much to ADG's surprise, in November 2021, ADG learned that U.S. Customs and Border Protection (CBP) was investigating Smart Glove on allegations of forced labor. And CBP, through a Withhold Release Order, detained gloves produced at certain Smart Glove factories—including those used to produce the gloves ADG

ordered—and quarantined the associated gloves at the ports of entry. Thus, 202 containers of gloves that ADG had purchased for delivery to HHS have been detained at the Ports of Los Angeles and Long Beach following the issuance of the Withhold Release Order on November 4, 2021.

5. Smart Glove deceived ADG. Smart Glove knew throughout the entirety of the relationship that it was under investigation by CBP on allegations of forced labor. And yet Smart Glove never once disclosed this material fact to ADG—not during ADG's factory tours, not during any logistics calls, and not during any of the semi-weekly calls between ADG and Smart Glove regarding the timing, production, and delivery of the goods.

6. Of course, had ADG known about those allegations of forced labor or CBP's investigation of those allegations at certain Smart Glove factories, it would not have agreed to have those factories supply gloves for HHS given the likelihood that a Withhold Release Order could be forthcoming. Indeed, that is precisely what happened with Smart Glove's top competitor in Malaysia, Top Glove Corporation Bhd (Top Glove), in July 2020. Indeed, CBP even issued a forced labor Finding against Top Glove in March 2021, at the very time ADG was negotiating its purchase of gloves from Smart Glove factories.

7. Smart Glove, however, concealed CBP's investigation, which ultimately led to ADG being forced to procure replacement gloves, causing substantial storage and demurrage costs to accrue on the detained gloves, causing the gloves to remain idle in containers at the ports for nearly a year, and impacting ADG's contract with HHS resulting in a descope of the contract and loss of approximately $50 million in revenue.

8. ADG therefore brings this action to recover substantial damages as a result of Smart Glove's fraudulent concealment of the investigation by CBP into Smart Glove's alleged use of forced labor and its interference with ADG's contract with HHS.

# THE PARTIES

9. ADG is a Delaware limited liability company. Its sole member is AirBoss Defense Group, Inc., a Delaware corporation with its principal place of business in Jessup, Maryland.

10. On information and belief, Smart Glove Holdings Sdn Bhd is a Malaysian limited company with its principal place of business in Malaysia. On information and belief, Smart Glove Holdings Sdn Bhd is the ultimate parent company of each of the defendants, and all members of Smart Glove Holdings Sdn Bhd are residents of foreign states.

11. On information and belief, Smart Glove International Pte Ltd. is a Singapore limited company with its principal place of business in Singapore or Malaysia.

12. On information and belief, Smart Glove Corporation Sdn Bhd is a Malaysian limited company with its principal place of business in Malaysia.

13. On information and belief, GX Corporation Sdn Bhd is a Malaysian limited company with its principal place of business in Malaysia.

14. On information and belief, Sigma Glove Industries Sdn Bhd is a Malaysian limited company with its principal place of business in Malaysia.

15. On information and belief, Platinum Glove Industries Sdn Bhd is a Malaysian limited company with its principal place of business in Malaysia.

16. On information and belief, each of the defendants is a member of the "Smart Glove Group" or "Smart Glove."[1]

---

[1] *See* Smart Glove, *About Us* (as of Sept. 15, 2022), perma.cc/55RJ-S58H; Smart Glove, *Fraud Statement* (as of Sept. 15, 2022), (identifying "[o]ur official subsidiaries and affiliates"), perma.cc/E68G-4QY9; *see also* Exhibit 1, Press Release, U.S. Customs and Border Protection, *CBP Issues Withhold Release Order on Malaysian Glove Producers* (Nov. 4, 2021), perma.cc/3JE9-NWZ8 (identifying "a group of companies collectively known as Smart Glove").

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because this action is between a citizen of a State and citizens of foreign states, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

18. This Court has personal jurisdiction over Defendants because they conduct business in California, have purposefully directed their activities toward California by exporting the subject product knowing that the ports of destination were in California (specifically Los Angeles and Long Beach), and have caused injury to ADG in California because the gloves have been detained at the Ports of Los Angeles or Long Beach under the control of the associated Port Commissioner.

19. Venue is proper in this Court under 28 U.S.C. § 1391(c)(3) because defendants are not resident in the United States or under § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated.

## FACTUAL ALLEGATIONS

**A.  AirBoss Defense Group**

20. ADG is a U.S.-based survivability company that provides government agencies, military, law enforcement, industrial providers, and first responders with a diverse portfolio of protective equipment that spans the entire survivability spectrum. AirBoss Defense, an ADG brand, is a recognized world leader in rapid deployment negative pressure isolation shelters, CBRNE (chemical, biological, radiological, nuclear and explosive) protective equipment, medical protective equipment, and personal respiratory protective products.

21. ADG is one of the largest suppliers of personal protective equipment (PPE) in North America, including in the United States. AirBoss Defense's emergency response and PPE is utilized by the U.S. Department of Defense, U.S. Department of State, FEMA, U.S. Department of Health and Human Services (HHS), Centers for

Disease Control and Prevention, and other government agencies as well as private companies.

### B. ADG's contract with HHS

22. In March 2021, ADG contracted with HHS to supply the agency with more than 18.2 million boxes of nitrile rubber gloves.

23. Under this federal government contract, ADG needed to provide HHS with specific information concerning the origin and sourcing of the gloves, including information regarding the glove manufacturers in Malaysia. Accordingly, ADG provided HHS with information regarding Smart Glove factories that would serve as manufacturers.

24. HHS required these gloves to urgently fill shortages for PPE resulting from the COVID-19 pandemic and to ensure the country was prepared for future public health emergencies.

### C. ADG's negotiations to procure Smart Glove gloves

25. On or around April 8, 2021, ADG was first introduced to Nathan Trading Co., Ltd. of Thailand (Nathan Trading) as a potential business partner that could help supply the required gloves.

26. ADG made clear from the outset of negotiations in telephone calls and email communications that it was procuring gloves to fulfill a contract with the U.S. government, specifically HHS, and that comprehensive disclosure of information by any participants in the supply chain and compliance with precise specifications set by HHS would be required.

27. On or around April 15, 2021, Nathan Trading advised ADG that Smart Glove would be the ultimate manufacturer of the gloves.

28. Nathan Trading did not, at the time of introduction to Smart Glove, disclose to ADG that CBP was investigating Smart Glove on allegations of forced labor.

29. On May 26, 2021, ADG personnel conducted a virtual tour of the first of five Smart Glove factories in Malaysia. The tour was hosted and led by senior executives and managers of Smart Glove, including its Chief Operating Officer, with the CEO of Nathan Trading in attendance.

30. During the factory tour, ADG personnel asked numerous questions regarding the manufacturing and delivery of the gloves.

31. ADG personnel participated in two additional tours of Smart Glove factories over the next several weeks.

32. During these factory tours, neither Smart Glove nor Nathan Trading informed ADG that CBP was investigating Smart Glove on allegations of forced labor. In fact, in response to ADG's question about the factories' ability to produce during COVID impacts, Smart Glove specifically and repeatedly indicated it had a stable, secure, and happy work force.

**D.  ADG contracts with a Smart Glove distributor**

33. ADG entered into a Sales and Purchase Agreement (the Agreement) on June 14, 2021, with Nathan Trading as seller and as an agent for Smart Glove to supply ADG with nitrile rubber examination gloves.

34. The Agreement included detailed product specifications and quality requirements, manufacturing assurances, pricing and volume terms, shipping terms, and other terms relating to the sale and purchase of the subject gloves.

35. Under the Agreement, Nathan Trading agreed that it would "only, and without exception" provide gloves "manufactured … at factory owned and operated by Nathan Trading Co., LTD, or by factories with documented partnering or joint venture agreements in place."

36. The Agreement specifically identified "the sub-contracted manufacturer" factories exclusively as members of Smart Glove: GX Corporation Sdn Bhd, GX Corporation Sdn Bhd (Specialty Plant), Sigma Glove Industries Sdn Bhd, Smart Glove Corporation Sdn Bhd, and Platinum Glove Industries Sdn Bhd.

37. The Agreement is clear that the end user of the gloves would be HHS.

38. As such, the Agreement imposed an obligation to "comply with the applicable terms and conditions of any agreements, obligations or other requirements ('Customer Terms') received by AirBoss Defense" from HHS.

39. Nathan Trading agreed to be "responsible for ascertaining how such disclosed Customer Terms and any Applicable Laws affect Seller's obligations under the Purchase Order, and Seller will at all times meet … all such disclosed Customer Terms and comply with all such Applicable Laws."

40. Nathan Trading also "warrant[ed] to AirBoss Defense, its customers, and users of the Products that all Products furnished pursuant to the PO shall … conform to all applicable laws, orders, regulations and standards where the Products are to be sold or used."

41. Under the Agreement, Nathan Trading agreed to "fully execute a Sales and Purchase Agreement (SPA) with the Contract Manufacturer that fully flows down all terms and conditions related to product conformity, quantity and delivery contained in this Agreement."

42. At no point before ADG entered into the Agreement with Nathan Trading to procure Smart Glove-produced gloves did either Smart Glove or Nathan Trading disclose to ADG that CBP was investigating Smart Glove on allegations of forced labor.

43. Pursuant to its March 2021 contract with HHS, ADG submitted the manufacturing subcontracts and supplier information to HHS and obtained agency approval.

**E.     Smart Glove manufactures and ships the gloves**

44. The day after executing the Agreement, on June 15, 2021, ADG conducted a virtual tour of another Smart Glove-designated factory in Malaysia.

45. The tour was again conducted by representatives of Smart Glove, including its then-COO, with Nathan Trading in attendance.

46. During the factory tour, ADG personnel again asked numerous questions regarding the manufacturing and delivery of the gloves.

47. Once again, neither Smart Glove nor Nathan Trading disclosed to ADG that Smart Glove was under investigation by CBP.

48. On June 17, 2021, ADG representatives participated in a comprehensive logistics discussion with Smart Glove representatives and Nathan Trading representatives.

49. ADG personnel again asked questions regarding the manufacturing and delivery of the gloves.

50. Once again, neither Smart Glove nor Nathan Trading disclosed to ADG that Smart Glove was under investigation by CBP.

51. On June 29, 2021, ADG representatives conducted another virtual tour of one of the five Smart Glove factories in Malaysia.

52. The tour was again conducted by representatives of Smart Glove with a Nathan Trading representative in attendance.

53. ADG personnel again asked questions regarding the manufacturing and delivery of the gloves.

54. Once again, neither Smart Glove nor Nathan Trading disclosed to ADG that Smart Glove was under investigation by CBP.

55. From approximately July 6, 2021, through mid-September 2021 when production was complete, ADG representatives participated in lengthy meetings with Smart Glove representatives at least twice per week.

56. During those numerous meetings, ADG personnel continued to ask substantive questions regarding the manufacturing and delivery of the gloves.

57. Within a week of the start of those meetings, on information and belief around July 12, 2021, Smart Glove retained an outside consulting firm to assess Smart Glove's labor practices in response to CBP's investigation.

58. At no point during any of the parties' discussions did Smart Glove or Nathan Trading disclose to ADG that Smart Glove was under investigation by CBP. And at no point over that four-month period of production did ADG see or hear of any indication that would lead ADG to believe the factories were using or had used forced labor. Instead, in response to ADG's question about the factories' ability to produce despite COVID impacts, Smart Glove specifically and repeatedly indicated it had a stable, secure, and happy work force.

### F. Smart Glove's Detained Gloves and Withhold Release Order

59. Before November 4, 2021, some gloves were successfully imported and delivered to HHS.

60. On information and belief, Smart Glove exported 202 containers of gloves from Malaysia in August and September 2021 destined for the ports of Los Angeles or Long Beach (the Smart Glove Detained Gloves).

61. While the Smart Glove Detained Gloves were in transit or "on the water," waiting to be offloaded at the Ports of Los Angeles or Long Beach, on November 4, 2021, CBP issued a Withhold Release Order, directing all U.S. ports of entry to "detain disposable gloves produced in Malaysia by a group of companies collectively known as Smart Glove." Among those companies were defendants Smart Glove Corporation Sdn Bhd, GX Corporation Sdn Bhd, Sigma Glove Industries Sdn Bhd, and Platinum Glove Industries Sdn Bhd.[2]

62. CBP issued the Withhold Release Order because "CBP identified seven of the International Labour Organization's (ILO) indicators of forced labor during its investigation."[3]

63. Under the November 4, 2021, Withhold Release Order, CBP detained the Smart Glove Detained Gloves under 19 C.F.R. §12.42(e).

---

[2] Exhibit 1, Press Release, U.S. Customs and Border Protection, *CBP Issues Withhold Release Order on Malaysian Glove Producers* (Nov. 4, 2021), perma.cc/3JE9-NWZ8 (emphasis added).
[3] *Id.*

64. After the issuance of the Withhold Release Order, ADG finally learned that Smart Glove was the subject of allegations of forced labor by CBP.

65. Upon learning of the Withhold Release Order, ADG promptly contacted Smart Glove and Nathan Trading to investigate and to attempt to resolve the issue.

66. There are two ways an importer can address a detention under a Withhold Release Order: an importer can re-export the goods to any location outside the United States under 19 C.F.R. § 12.44(a), or an importer can request the goods' release by providing proof of admissibility within three months under 19 C.F.R. § 12.43.

67. In reliance on Smart Glove's repeated assurances that the allegations against it were not true, ADG decided to provide proof of admissibility of the Smart Glove Detained Gloves to CBP.

68. As part of ADG's submission to CBP, Smart Glove provided an "executive summary" of an "Independent Assessment Report" prepared by KPMG Management & Risk Consulting Sdn Bhd (KPMG). Smart Glove did not provide a copy of the Independent Assessment Report to ADG, but, on information and belief, Smart Glove provided CBP with a full copy of KPMG's report.

69. Since the submission, the Smart Glove Detained Gloves have remained in their shipping containers at the ports awaiting CBP's final decision whether to admit them or not.

70. The detention of the Smart Glove Detained Gloves caused ADG to be unable to fulfill certain timelines set forth in its contract with HHS.

71. Additionally, the detention of the Smart Glove Detained Gloves has caused substantial costs to accrue for storage and related fees and even resulted in a lawsuit against ADG by a carrier to recover accrued storage and demurrage charges as a result of the detention of the Smart Glove Detained Gloves.

72. Had ADG known that Smart Glove was under investigation by CBP, ADG would not have agreed to have the Smart Glove factories under investigation supply the gloves, given the obvious potential reputational damage to ADG, the potential risk

of the issuance of a Withhold Release Order, and all the costs that would be incurred as a result.

### G. Smart Glove concealed an investigation into potential use of forced labor in its factories

73. Unbeknownst to ADG at the time, on information and belief, at least as early as January 2021, Smart Glove knew about concerns regarding forced labor and employee welfare, and Smart Glove issued statements to its employees regarding those concerns.

74. Unbeknownst to ADG at the time, on information and belief, in March 2021, Mr. Andy Hall filed a petition (e424G316202118) with CBP providing information on alleged forced labor conditions at Smart Glove.[4]

75. Unbeknownst to ADG at the time, CBP acknowledged receipt of Mr. Hall's petition on March 19, 2021, and indicated that the information provided "is sufficient to investigate the merits of this allegation."[5]

76. On information and belief, Smart Glove learned about Mr. Hall's petition and CBP's investigation from either CBP or Mr. Hall in March, April, or May 2021. And Smart Glove had known about forced-labor concerns at least as early as January 2021—all before ADG entered into the Agreement to purchase Smart Glove-produced gloves.

77. Yet, at no time before ADG's entry into the Agreement, did Smart Glove or Nathan Trading disclose to ADG that Smart Glove was the subject of forced-labor concerns or allegations nor that CBP was investigating Smart Glove on allegations of using forced labor.

---

[4] Exhibit 2, Letter from Therese Randazzo to Andy Hall (Mar. 19, 2021).
[5] *Id.*

78. Unbeknownst to ADG at the time, on May 24, 2021, *International Trade Today* published an article identifying Smart Glove as one of three glove companies named in recent forced-labor petitions filed by Mr. Hall with CBP.[6]

79. According to the article, Mr. Hall provided CBP's response to his petition against Smart Glove to *International Trade Today*. *Id.*

80. Also, according to the article, *International Trade Today* attempted to contact Smart Glove (and other companies) about the allegations but "[n]one of the companies responded to requests for comment."[7]

81. On information and belief, Smart Glove learned about CBP's investigation into forced-labor allegations no later than May 24, 2021, from a representative from *International Trade Today* seeking comment on the article.

82. Yet, at no time before ADG's entry into the Agreement, did Smart Glove or Nathan Trading disclose to ADG that CBP was investigating Smart Glove on allegations of using forced labor.

83. On information and belief, Smart Glove engaged KPMG on July 12, 2021, to prepare an "independent assessment" of Smart Glove's forced-labor practices. By this time, Smart Glove must have known it was being investigated by CBP on allegations of using forced labor.

84. Yet, at no time on or around July 12, 2021, did Smart Glove or Nathan Trading disclose to ADG that CBP was investigating Smart Glove on allegations of using forced labor. Instead, as alleged above, Smart Glove specifically and repeatedly indicated it had a stable, secure, and happy work force.

---

[6] Exhibit 3, Tim Warren, *Multiple Malaysian Companies Facing Forced Labor Allegations*, International Trade Today (May 24, 2021), perma.cc/Z7SC-8564.

[7] *Id.*

85. It was not until after CBP issued the Withhold Release Order on November 4, 2021, that ADG learned that CBP was investigating Smart Glove on allegations of using forced labor in the manufacture of gloves.[8]

86. Smart Glove undoubtedly understood the materiality of the information that it was under investigation by CBP.

87. Among other reasons, Smart Glove's largest competitor in Malaysia had already publicly suffered the consequences of a CBP investigation and Withhold Release Order regarding forced-labor allegations.

88. In July 2020, CBP issued a Withhold Release Order against gloves manufactured by Top Glove, requiring any such gloves to be detained at the border.[9]

89. And on March 29, 2021, CBP published its final Finding of forced labor by certain Top Glove facilities and ordered port directors to "seize the covered merchandise for violation of 19 U.S.C. 1307 and commence forfeiture proceedings."[10]

90. Consistent with what happened to its largest competitor in Malaysia, Smart Glove must have known that the CBP investigation into its own factories could lead to a Withhold Release Order requiring the detention of its gloves. Yet, at no point from March 2021 through November 2021 did Smart Glove tell ADG that certain of its factories were being investigated by CBP nor that such an investigation might result in protracted detention of the Smart Glove Detained Gloves at the borders.

91. Indeed, it was not until September 9, 2021, after nearly all the Smart Glove gloves had departed Malaysia for the ports of Los Angeles and Long Beach, that CBP finally permitted Top Glove to resume importation.[11]

---

[8] Exhibit 1, Press Release, U.S. Customs and Border Protection, *CBP Issues Withhold Release Order on Malaysian Glove Producers* (Nov. 4, 2021), perma.cc/3JE9-NWZ8 (emphasis added).

[9] *Notice of Finding That Certain Disposable Gloves Produced in Malaysia With the Use of Convict, Forced or Indentured Labor Are Being, or Are Likely To Be, Imported Into the United States*, 86 Fed. Reg. 16,380, 16,380 (Mar. 29, 2021).

[10] *Id.*

[11] Press Release, U.S Customs and Border Protection, *CBP Modifies Forced Labor Finding on Top Glove Corporation Bhd.* (Sept. 9, 2021), perma.cc/QN8N-846A.

**H.    Harm to ADG**

92.    Because of Smart Glove's concealment of the fact that it was being investigated by CBP on allegations of forced labor, ADG has incurred substantial damages.

93.    To date, ADG incurred at least more than $11.6 million in charges for protracted demurrage, storage, and other Withhold Release Order-related charges, more than $12.3 million in logistics costs to procure alternative gloves, lost profits of more than $12.6 million, and potential inventory losses upwards of $32 million. ADG has thus been damaged in an amount of more than $68.5 million on account of Smart Glove's conduct and has or will likely suffer other or further damages in an amount to be proven at trial.

## CLAIMS FOR RELIEF

### COUNT I
### FRAUD BY CONCEALMENT

94.    ADG incorporates all prior paragraphs as though fully set forth herein.

95.    Smart Glove engaged in fraudulent concealment of the fact that it was under investigation by CBP on allegations of forced labor throughout the period from March 2021 through November 4, 2021.

96.    Smart Glove itself and through its agent Nathan Trading intentionally failed to disclose those facts.

97.    Smart Glove disclosed related facts—including information about timing and the ability of its workforce to meet those timing requirements—but intentionally failed to disclose that it was under investigation by CBP that could result in a Withhold Release Order and protracted detention of the goods. That failure to disclose made Smart Glove's disclosures about timing and its work force deceptive.

98.    Smart Glove intentionally failed to disclose the fact that it was under CBP investigation, a fact that was known only to Smart Glove and that ADG could not have reasonably discovered.

99. At all times before November 4, 2021, ADG did not know that Smart Glove was under investigation by CBP on allegations of forced labor.

100. On information and belief, Smart Glove intended to deceive ADG by concealing the fact that it was under investigation by CBP on allegations of forced labor.

101. Had Smart Glove disclosed that certain of its factories were under investigation by CBP on allegations of forced labor, ADG would have behaved differently, including by not agreeing to have the under-investigation factories supply gloves to ADG.

102. ADG has suffered and is continuing to suffer substantial damages as a result of Smart Glove's fraudulent concealment of the fact that it was under investigation by CBP on allegations of forced labor, including incurring substantial storage and demurrage costs, forcing ADG to procure replacement gloves, lost profits, and physical damage to glove inventory from having sat at the ports for nearly a year.

103. Smart Glove's concealment was a substantial factor in causing ADG's harm.

104. Smart Glove's conduct was fraudulent, oppressive, and/or malicious.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT

105. ADG incorporates all prior paragraphs as though fully set forth herein.

106. ADG had a contract with HHS under which ADG was to supply gloves to HHS.

107. Smart Glove knew of the existence of ADG's contract with HHS at least because ADG told Smart Glove about its existence through Nathan Trading and in numerous communications beginning in April 2021.

108. Smart Glove's conduct made ADG's performance under its contract with HHS more expensive and difficult, including because Smart Glove failed to tell ADG that it was under investigation by CBP on allegations of forced labor.

109. Smart Glove intended to disrupt the performance of this contract and/or knew that disruption of performance was certain or substantially certain to occur as a result of its actions.

110. ADG has suffered and will continue to suffer harm as a result of Smart Glove's intentional interference with ADG's contractual relations.

111. Smart Glove's conduct is and will be a substantial factor in causing ADG's harm.

112. Smart Glove's conduct was fraudulent, oppressive, and/or malicious.

## PRAYER FOR RELIEF

WHEREFORE, ADG respectfully requests that the Court:

a. award ADG any available actual damages in an amount of $68.5 million or as otherwise proven at trial;

b. award ADG all available exemplary and punitive damages;

c. award ADG its attorneys' fees and costs; and

d. award such additional or other relief as it deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 19, 2022              MCDERMOTT WILL & EMERY LLP

                                       By:  /s/ *Julian L. André*
                                            JULIAN L. ANDRÉ

                                       *Attorneys for Plaintiff*
                                       *AirBoss Defense Group, LLC*